Kevin P. Brennan, pro se
1700 Barr Avenue
Apt 3
Pittsburgh, PA 15205

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **KEVIN P. BRENNAN,** | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. _____ |
| | ) | |
| vs. | ) | Jury Trial Demanded |
| | ) | |
| **UNITED STATES DEPARTMENT OF JUSTICE** | ) | |
| | ) | |
| **SECURITIES AND EXCHANGE COMMISSION** | ) | |
| | ) | |
| **FEDERAL BUREAU OF INVESTIGATION** | ) | |
| | ) | |
| Defendants. | ) | |

18CV3647

COMPLAINT

Plaintiff Kevin P. Brennan, brings this Complaint against defendants the United States Department of Justice; the Securities and Exchange Commission; and the Federal Bureau of Investigation, alleging as follows:

1

## NATURE OF THE ACTION

This is an action for money damages and declaratory and injunctive relief brought pursuant to the Fifth and Sixth amendments to the United States Constitution, and 42 U.S.C. Sec 1983. Plaintiff alleges that these constitutional violations were committed by the acts or omissions of the defendants.

## JURISDICTION AND VENUE

1. Plaintiff believes that the U.S. District Court has jurisdiction over this action pursuant to 28 U.S.C. sec 1331 and 1343 because Plaintiffs' claims arise under the Constitution and the laws of the United States.

2. Venue is proper pursuant to the Securities Exchange Act of 1934 as stated in US v. Lange, 2016 US app LEXIS 14929 which provided for venue, in securities fraud cases, in the district wherein any act or transgression constituting the violation occurred. Since the alleged acts complained by the government would have occurred as a result of transactions relating to the NASDAQ stock market, which is located within the Southern District of New York, the venue in the Southern District of New York is proper.

## PARTIES

3. Defendant United States Department of Justice, is an agency of the Executive branch of the Federal Government.

4. Defendant Securities and Exchange Commission, is an agency of the Federal Government.

5. Defendant Federal Bureau of Investigation, is an agency of the United States Department of Justice, an agency of the Executive branch of the Federal Government.

6. Plaintiff is a citizen of the United States of America.

## FACTUAL BACKGROUND

7. This action arises from a series of events starting on or about January of 2010. Knowledge of the events were first revealed in an indictment filed by the Justice Department in the Southern District of Florida on March 20, 2012.

8. The plaintiff was the CEO of a newly reporting and trading public company based in Pittsburgh, PA. The Company, Optimized Transportation Management, Inc. (OPTZ) operated in the logistics industry. The Company became a reporting and trading company in July of 2009.

9. The Company was completing an acquisition of an Ohio based trucking company in January of 2010, when an individual, Richard Epstein was introduced to the Plaintiff by a Company consultant. Epstein was referred by the consultant to the Plaintiff, as someone who could help the Company raise funds to finance the acquisition.

10. In a telephone call, Richard Epstein, introduced himself and during the conversation Epstein mentioned he knew a broker, who for a fee to be paid in "free trading" stock, would buy shares of the Company, in the market. Epstein stated during the call that the Plaintiff should meet with him, Epstein, in Florida where Epstein resided.

11. In February the Company completed a round of financing with a fund in New York City and closed on the acquisition.

12. In March of 2010, the Plaintiff was attending a broker/dealer conference in Florida. The Plaintiff, in his role as CEO of OPTZ, was presenting the Company to the member broker/dealers at the conference, for the purpose of raising the awareness of the Company to the broker/dealer attendees, and with the hopes of expanding the public market for the Company's stock.

13. Because the conference was in Fort Lauderdale, Florida, the city where Epstein resided, the Plaintiff asked the consultant to arrange a meeting at the conference with Epstein.

14. In March of 2010, at the conference the Plaintiff was attending, the Plaintiff met with the consultant's contact, Epstein.

15. At the meeting with Epstein, after the Plaintiff devoted most of the meeting time to giving his speech promoting OPTZ, Epstein told the Plaintiff that his broker friend would buy OPTZ stock in the NASDAQ market for a fee. The fee was payable in free trading stock. The rate of payment, Epstein told the Plaintiff, would be 1 share of OPTZ "free trading" shares for every three shares Epstein's broker friend would buy in the market. In addition, since the payment of the brokers fee would not occur until after the broker could show proof of the shares the broker purchased, the broker demanded a deposit be made in "free trading" shares as security.

16. The Plaintiff owned no common stock in OPTZ, and the Company was precluded by SEC regulations from issuing shares of "free trading" common stock.

17. In March of 2011, an agent of the Federal Bureau of Investigation in Miami called the Plaintiff and told the Plaintiff that Epstein, the individual the Plaintiff met in March of 2010, had been a government agent and that the Plaintiff had violated securities laws. The Plaintiff was instructed to attend a meeting at FBI headquarters in Miami where he was shown a video tape of the meeting he attended with Epstein, the government agent. At this meeting the government presented a plea agreement to the Plaintiff, but at no time did the government reveal that there was no broker involved in their scheme.

18. The Plaintiff knew he had not broken any laws and declined to sign the government's plea agreement.

19. The Plaintiff was arrested in June of 2012, in Pittsburgh. The Plaintiff was assigned an attorney in Miami at his arraignment.

20. The Plaintiff went to trial in February of 2013 and was convicted of securities fraud. He was immediately remanded to prison.

21. In June of 2013 the Plaintiff was sentenced to 75 months in prison.

22. The Plaintiff is currently under house arrest after serving nearly five years in prison.

## COUNT I – DUE PROCESS, FIFTH AMENDMENT

23. The Plaintiff was denied his right to a fair process, by the defendants from the indictment through the trial and sentencing hearing, until the present, violating his Fifth Amendment right to due process.

### The Indictment

24. The Fifth Amendment of the United States Constitution provides that no person shall be held for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury; nor be deprived of life, liberty, or property, without due process of law.

25. The Department of Justice wrote in the indictment that was presented to the grand jury that:

"the Defendant (Plaintiff) agreed to engage in a pay for play scheme to cause a stockbroker to purchase OPTZ stock in exchange for a kickback. According to the scheme the stockbroker, in exchange for a kickback, would breach his fiduciary duty to his clients by misusing money in discretionary accounts to buy OPTZ's stock in the market."

26. The government failed to disclose in the indictment, at the trial, and subsequent filings through the present, the fact that there was no stockbroker, and there were no clients. There was no misuse of money in discretionary accounts, there was no client money, there were no client accounts, and of course there was no fiduciary relationship with any clients. The entire scheme was a fraud, but neither the grand jury nor the trial jury, nor any reader of subsequent documents, was told this by the government. This indictment was given to the jury to refer to during their deliberations. Again, no mention was made that there was no broker or clients.

### The trial

27. The attorney appointed by the government to represent the Plaintiff at the trial had no knowledge of securities law. The temporary Judge that was appointed to hear the trial, was an eighty-six-year-old retired judge imported from the International Trade Court and was residing in Minnesota. The Judge was staying on Miami Beach, on vacation, during the trial. The Judge

likewise had no expertise in securities law. The government described the scheme as it had in the indictment, and once again never mentioned to the jury that there was no broker, and there were no clients.

28. The Judge, in his instructions to the jury, stated that, "What must be proven beyond a reasonable doubt is that the defendant (Plaintiff) knowingly devised or intended to devise a scheme to defraud that was substantially the same as the one alleged in the indictment." The Judge never mentioned to the jury, that this was an impossibility, due to the fact that there was no broker and there were no clients.

29. At the trial, the prosecutor went so far as to describe the non-existent clients to the jury. While cross-examining the Plaintiff, the prosecutor asked the Plaintiff, "Okay, so he's (broker) got some control over these accounts belonging to whom?" The Plaintiff responded, "I didn't believe any of that. But he (Epstein) says Latin Americans, Mexicans, and..." The prosecutor broke in and said, "I just want to make sure you understand my question sir. I'm not asking whether you believed it. I'm asking what was he (Epstein) referring to?" The Petitioner replied, "He (Epstein) was talking about Latin American Mexicans and Latinos." The prosecutor went on to ask, "Okay. Relatively wealthy area, right? 30 to 40 million dollars in these accounts, correct?" Finally, the prosecutor said in front of the jury, "And he (broker) manages their money. So that's payment in exchange for his use and abuse of the discretionary accounts?" The Prosecutor just testified to the jury that there was no crime, because the key point in the scheme obviously could never have happened. There was no broker. There were no clients.

30. The prosecutor knew there was no broker and there were no clients. The prosecutor knew he was describing activities and characters to the jury that did not exist. There was no broker, there were no clients, and there were no multi-million-dollar accounts. This was an effort to distract the jury and confuse them. Neither the Prosecutor nor the Judge made sure the jury was aware that the broker and the broker's clients did not exist. The Justice Department, the FBI agent in his testimony, and the Court allowed this outrageous government scam to continue, violating the Plaintiff's right to a fair trial and the Plaintiff's Fifth Amendment right to due process.

31. At the trial, the prosecutor went a step further and had his two witnesses testify that it was illegal to pay a broker. The prosecutor asked Epstein the government co-operating witness, "And in your experience is a stockbroker

generally supposed to get a kickback for buying shares on behalf of his client?" Epstein answered, "No that's illegal." Epstein then said, "Well it's illegal for a stock broker to take compensation other than commission that he makes from the brokerage firm."

This testimony was made in front of the jury. Both the prosecutor and the Judge knew there was no broker, there was no brokerage firm, and there were no clients. Obviously, the jury was affected by this testimony and certainly was biased against the Plaintiff. No one informed the jury that there was no broker and no payment was made to a broker.

32. The other co-operating witness (Huggins) stated, "And I told Brennan (Plaintiff) you can't pay a broker, its illegal." To further his point the prosecutor himself told the jury, "that very same illegal deal?". At the end of the trial the prosecutor then told the jury that, "Brokers are not supposed to do this. The Broker could lose his license." The Prosecutor then told the jury, "Mr. Huggins, who testified, said the deal was illegal. And he said the deal was illegal because it was illegal. You can't pay a broker." Finally, the prosecutor told the jury, "And as to Mr. Brennan, guilty on counts 2 and 3 of engaging in securities fraud, OF PAYING THE BROKER." Never was any law, rule, or regulation cited to support the government's position that it was illegal to pay a broker, because there is none. It is not illegal to pay a broker. There is no law, rule, or regulation to support the government's position that it is illegal to pay a broker. The Plaintiff was found guilty of securities fraud because the prosecutor told the jury the Plaintiff paid the broker. There was no broker, and the prosecutor knew it. Over and over the jury heard about the broker and the illegal act of paying the broker.

33. Had anyone bothered to do any research in securities law, they would have found the following buried in the regulations of the Exchange Act.

Sec.15g-4 Disclosure of Compensation to brokers or dealers.

(a) Disclosure requirement. It shall be unlawful for any broker or dealer to effect a transaction in any penny stock for or with the account of a customer unless such broker or dealer discloses to such client, within the time periods and in the manner required by paragraph (b) of this section, the aggregate amount of any compensation received by such broker or dealer in connection with such transaction.

7

34. Setting aside the fact that there was no broker or clients, it is clear that the only issue regarding payment to a broker is the requirement that the broker disclose his compensation to his client.

35. The plaintiff was found guilty of securities fraud because the prosecutor told the jury the Plaintiff paid the broker. There was no broker, and the prosecutor knew it. Over and over the jury heard about the broker and the illegal act of paying the broker. Never did the Justice Department, the FBI, or the SEC cite the law on broker compensation.

## COUNT II – CONFRONTATION, SIXTH AMENDMENT

36. The Sixth Amendment of the Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to a public trial by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and have the Assistance of Counsel for his defense.

37. The justice department from the filing of the indictment through the ensuing trial continually asserted that the Plaintiff paid a broker to use his client's money to buy stock in the market. The judiciary had its witnesses testify to these facts. The FBI had its agent preside over the scheme and also testify to these facts. Even the Judiciary supported the argument. No one stated that there wasn't any broker, and there weren't any clients. The Plaintiff was therefore prevented from confronting the only witnesses against him who were supposedly involved in the scheme the government said occurred. The Plaintiff was precluded from confronting the broker who the government and the FBI said was paid by the Plaintiff to buy stock. The Plaintiff was also unable to confront the broker's clients, who the government said, had their money, which was deposited in the broker's discretionary accounts, and misused by the broker in the purchase of the shares.

38. The Plaintiff's Sixth Amendment constitutional right to confronting witnesses against him, was denied by the Justice department and the Federal Bureau of Investigation.

## COUNT III – REPRESENTATION OF EFFECTIVE COUNSEL, SIXTH AMENDMENT

39. The Plaintiff wrote a letter from prison to the District Court Judge, asking that the government appointed attorney representing him be removed, prior to his Direct Appeal. The Plaintiff was denied, without any explanation, which is a violation of his Sixth Amendment right to have either an effective and competent attorney represent him or the right to represent himself. The Plaintiff fearful of the Defendant's reaction to the letter sent to the District Court, (the letter was published on Pacer), asked the government appointed attorney to not file a brief with the Appeals Court until the Plaintiff could read the brief. The government appointed attorney ignored the Plaintiff and filed an appeal brief that addressed no issues regarding the trial and cited an incorrect guideline in the argument he presented to the Circuit Court concerning the loss enhancement. The incorrect guideline effectively voided any argument the Plaintiff could have raised correcting the determination of the loss enhancement. This error by the attorney led to a 57 month increase in the length of prison time. Since no trial errors were raised in the attorney's appeal brief, any opportunity the Plaintiff had to raise the issues discussed above, were lost to the Plaintiff. This caused the Plaintiff to be unable to raise the issues to prove that he was innocent of the crime of securities fraud.

40. The Plaintiff wrote a desperate letter to the Eleventh Circuit Court of appeals once he was able to read the government appointed attorney's appeal brief. The Plaintiff asked the Court to remove the attorney and ignore the appeal brief the government appointed attorney prepared and filed with the Circuit Court. The Court did not respond. When the Plaintiff was finally able to represent himself in a filing he made to the district Court under section 2255, the Magistrate Judge, in his report, wrote that the 2255 can't be a surrogate for the direct appeal. He was confirming the fact that the Court by forcing an incompetent attorney to represent the Plaintiff in his direct appeal, against the communicated wishes of the Plaintiff, contributed in denying the Plaintiff his due process right to a fair appeal.

41. Because the Plaintiff has been forced by the Court's to have an ineffective government appointed attorney represent him, in violation of several Supreme Court decisions, the District Court in the Southern District of Florida, and the Eleventh Circuit Court of Appeals have continually

refused to address the issues raised in this complaint.

## CONCLUSION

42. Never has the Justice Department's gross misconduct as detailed above been addressed by the Courts. The Plaintiff has been procedurally barred from presenting his case. The Courts have been indifferent to the Plaintiff's constitutional rights, and the Plaintiff's continued efforts, to save his life and seek justice. It seems the Courts in the Southern District of Florida believe an innocent man should quit and go quietly into this good night. This complete indifference to the Plaintiff's constitutional rights, regardless of when they are discovered by the Plaintiff, has resulted in an innocent man being imprisoned for over five years, to the total indifference of the Court.

43. Again, as just one example of the government's unlawful behavior, the prosecutor told the Court and the Jury, "And as to Mr. Brennan, guilty on Counts 2 and 3 of engaging in securities fraud, OF PAYING THE BROKER." The prosecutor knew there was no broker, and so did the Court. The prosecutor also knew there was no law, rule or regulation that made it illegal to pay the broker. The Plaintiff did not pay a broker either. No one told the jury this though. The prosecutor clearly violated the Supreme Court's decision in Giglio specifically where it applies to a prosecutor who made "explicit representations to the court or implicit factual representations to the jury," knowing these representations were false. U.S. v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995).

## JURY DEMAND

30. Plaintiff hereby demands trial by jury pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.

## PRAYER FOR RELIEF

31. WHEREFORE, Plaintiff asks this Court:

   A) To declare that Plaintiff's fifth amendment rights to the Constitution of the United States were denied by the defendants.

   B) To declare that Plaintiff's sixth amendment rights to the Constitution of the United States were denied by the defendants.

   C) To preliminarily and permanently enjoin the defendants from denying Plaintiff's constitutional rights as set forth in this Complaint.

   D) To award Plaintiff compensatory damages for the past loss of Constitutional rights as set forth in this Complaint.

   E) To award Plaintiff damages for physical and emotional harm while in prison, plus punitive damages.

   F) To award Plaintiff fees costs and expenses incurred in pursuing this Complaint.

   G) Any other relief that may be just and proper.


Respectfully Submitted this 23 day of April 2018

*Kevin P. Brennan* (signature)

Kevin P Brennan
1700 Barr Ave. #3
Crafton, Pa 15205
(412) 458-5531
kptb9751@gmail.com

Certificate of Service

I hereby certify that Plaintiff served a true and correct copy of the within Complaint by first call United States postage prior to 5p.m. upon the following counsel this ___ day of April 2017:

OFFICE OF THE UNITED STATES ATTORNEY

1 Saint Andrews Plaza
New York, NY 10007

By: _____
Kevin Brennan

Certificate of Service

I hereby certify that Plaintiff served a true and correct copy of the within Complaint by first call United States postage prior to 5p.m. upon the following counsel this [illegible] day of April 2017:

OFFICE OF THE FEDERAL BUREAU OF INVESTIGATION

935 Pennsylvania Avenue, NW.
Washington, D.C. 20535-0001

By: _____
Kevin Brennan

Certificate of Service

I hereby certify that Plaintiff served a true and correct copy of the within Complaint by first call United States postage prior to 5p.m. upon the following counsel this 7__ day of April 2017:

OFFICE OF THE SECURITIES AND EXCHANGE COMMISSION

100 F St NE,
Washington, DC 20002

By: _____
Kevin Brennan

Kevin Brennan
1700 Barr Ave
Apt 3
Crafton, PA 15205




U.S. POSTAGE
PAID
CORAOPOLIS, PA
15108
APR 20, 18
AMOUNT
$1.63
R2304M111411-09

Pro Se
SM

Clerk
United States District Court
Southern District of NY
The Patrick Moynihan US Courthouse
500 Pearl St
New York, New York 10007

RECEIVED
2018 APR 23 PM 4:22
CLERK'S OFFICE
S.D.N.Y.

USM P3
SDNY